JOHN E. PATTON v. SINCLAIRE LUMBER COMPANY.

(Filed 20 December, 1919.)

1. Contracts—Written Instruments—Parol Evidence—Merger.

All the various steps of a negotiation merge into the written contract, when executed, which precludes parol evidence as to what the intention of the parties may have theretofore been when at variance with the terms of the written instrument.

2. Same—Timber—Lumber—Place of Delivery.

Parties entered into a written contract for the cutting of timber and manufacturing it into lumber, for which the plaintiff was to pay the defendant contractor a certain price when delivered and piled on yards to be provided by the defendant at a certain station without further specifications, which the defendant provided. The plaintiff was allowed to show that it was contemplated by the parties before and at the time

the writing was executed that he could acquire a certain tramroad for the purpose of delivering the lumber, and that the defendant had breached the contract by failing to provide yards for piling the lumber accessible or available therefor at the terminus of this tramroad, at the stated designation: *Held,* evidence of such contentions was of a variance, by parol, of the written instrument, and its admission was reversible error.

**3. New Trials—Issues—Appeal and Error.**

Where the prejudicial error committed by the Superior Court underlies or affects all the issues submitted to the jury, a new trial will be granted on all of them, and not confined to one or more of them in the discretion of the court.

CIVIL ACTION, tried before *Ray, J.,* and a jury, at April Term, 1919, of BUNCOMBE.

The action was brought to recover damages alleged to have resulted from a breach, on the part of the defendant, of a contract between the parties in regard to the cutting, logging, and manufacturing into lumber of certain standing timber on land in the county of McDowell, near Old Fort, being approximately 4 to 5 miles from that place. The contract was in writing, and its execution was admitted at the trial of the cause. The portions of the contract material to the controversy are:

"1. The contractor shall cut into logs and saw into lumber and pile on sticks at the mill site, as directed by the company, all the merchantable timber standing, lying and being on the land above described according to the terms of this contract, and when dry to be delivered and piled on a sidetrack of the Southern Railway Company at Old Fort, said sidetrack and sufficient piling ground to be provided by the company: *Provided, however,* if the contractor desires, he shall have the right to haul lumber while green to the piling ground provided by the company on the sidetrack at Old Fort, and place same in hacks in said piling ground as specified, and if this is done, then said lumber shall be measured and the full contract price of $11.50 per thousand feet shall be paid on the 5th day of each month for all lumber so hauled and hacked during the preceding month. If, however, said lumber is hacked in the woods, then said lumber is to remain on sticks not less than four nor more than six months.

"2. The contractor shall cut and log merchantable timber and manufacture the same into lumber and pile on yards at the rate of an average of 12,500 feet of lumber, board measure, per day, for at least 20 days of each month, except the months of January and February of each year, during the continuance of this contract, with the privilege to the contractor to cut, saw and deliver not exceeding 20,000 feet of lumber per day, beginning 30 days from date of contract and ending when all the merchantable timber to be manufactured under this contract shall have been cut and removed from said land.

"3. In consideration of the services rendered by the contractor in cutting, logging, sawing and placing on sticks, and delivery at Old Fort, of the merchantable timber therein agreed to be sawed, the company shall pay the contractor the sum of $11.50 per thousand feet, board measure, for all lumber sawed and put on sticks and delivered, as aforesaid, $10 per thousand feet of the aforesaid amount to be paid when said lumber is placed on sticks on the yards at the mills: *Provided, however,* that the popular square shall only be piled and shall at once be hauled to the railroad at Old Fort, and placed in the sheds provided by George Chapman; the contractor to be paid in cash on or before the 5th day of each month for all lumber sawed during the preceding month according to the estimates. The final measurements of the lumber to be made by an inspector to be furnished by the company at Old Fort, and to be according to the rules laid down by the National Hardwood Association, and the contractor shall have the right to be present, if he so desires, at the time said measurements is made, or to have a representative present in his stead: *Provided, however,* if the contractor desires, he shall have the right to haul lumber while green to the piling ground provided by the company on the sidetrack at Old Fort, and place same in hacks on the piling ground as specified, and if this is done, then the lumber shall be measured and the full contract price of $11.50 per thousand feet shall be paid on the 5th day of each month for all lumber so hauled and hacked during the preceding month.

"4. The company shall pay to the contractor half of the amount necessary to secure right of way for removing logs and lumber. Said amount to be based on and determined by receipts presented to the company by the contractor, showing actual payments for said right of way.

"5. It is understood and agreed between the parties hereto that the contractor shall pay to the company $3 per thousand feet for all logs now cut and logged on yards, and 75 cents per thousand feet for all logs now cut and not on yards."

The plaintiff alleged a breach of the contract, in that:

1. The defendant failed to pay for the sawing and delivery of lumber, as it had agreed to do.

2. The defendant failed to pay for one-half the costs of rights of way.

3. The defendant failed to furnish sidetrack and piling ground at Old Fort, as it had agree to do.

The plaintiff further alleged that after the execution of the contract, and after he had begun his preparations for commencing the work, the defendant was not ready for him to begin work, and that he was damaged by reason of having to hold idle his mill and teams in Asheville.

The plaintiff further alleged that, at the request of the defendant, he had stopped the operation of his mill for two or three days, and that he was damaged thereby.

The defendant answered, denying the material allegations of the complaint, alleging full payment to the plaintiff of all sums due him under the contract, and by way of counterclaim alleging a breach of the contract by the plaintiff, and an overpayment of all sums due the plaintiff by the defendant, and prayed judgment on the counterclaim.

At the time of the execution of the contract between plaintiff and defendant there was a small tramroad running from Old Fort to a point about a half mile from the nearest timber. This tramroad, referred to in the testimony as a "dinky road," was at the time of the execution of the contract, owned and controlled by third parties, neither the plaintiff nor the defendant having any interest whatever therein. The plaintiff, however, after the execution and delivery of the contract, acquired this "dinky road" and undertook to utilize it in the delivery of the lumber mentioned in the contract. The defendant contended that, at the time of the purchase of the tramroad by the plaintiff, there was no piling ground or Southern Railway sidetrack adjacent thereto, but that it had furnished ample piling and sidetrack facilities at Old Fort, during the entire operations by the plaintiff, and some twelve months after the plaintiff commenced work, it did have piling ground and sidetrack facilities at a point adjacent to the terminus of plaintiff's tramroad, and that soon after the sidetracks last mentioned was placed, it was damaged by high waters, and the plaintiff repaired the same, or attempted thereafter to use it. The defendant further contended that some time thereafter the plaintiff stopped operations, leaving a large quantity of manufacturd lumber on sticks at his mill site, together with large quantities of logs cut and in the woods, and also a large portion of the standing timber, which was the subject-matter of the contract, uncut, and thereupon brought this suit for the alleged damage.

The plaintiff alleged that he stopped work because of the defendant's failure to perform its part of the contract.

There was a dispute as to the accuracy of these allegations, though it appears to be true that, at the time the contract was made, the plaintiff owned no interest in the tramroad.

The jury answered the issues as to claims and counterclaims in favor of the plaintiff.

The court admitted evidence and charged the jury that if the parties contemplated, at the time of making the contract, that the "dinky road" or tramroad, extending into the timber boundary, should be acquired by plaintiff and operated by him in connection with the sidetrack and piling ground at Old Fort, and that the latter should be accessible or convenient to the "dinky road," so that plaintiff could haul his lumber green instead of dry, and thereby save in the cost of hauling and price of the lumber, and the defendant did not comply with this understanding

of the parties, but failed to furnish such a siding and piling ground as contemplated, this would be a breach of the contract and entitle plaintiff to damages. Exception was taken to this and many other instructions and rulings.

Judgment was entered upon the verdict, and defendant appealed.

*Craig, Erwin & Craig and Mark W. Brown for plaintiff.*
*Dorman Thompson, W. D. Turner, and Merrimon, Adams & Johnston for defendant.*

WALKER, J., after stating the relevant facts as above: There are numerous exceptions stated in this case, but we will confine ourselves to only one of them, as we think that the court erred in its ruling and instruction covered by that exception. The contract is plainly and explicitly worded, and there is no doubt as to its meaning. The defendant was required to furnish a piling ground and sidetrack at Old Fort for stacking the lumber hauled by the plaintiff to that point and for convenience of transportation, but no particular place for the sidetrack and piling ground is specified, and nothing whatever is said in the contract about the tramroad. So far as appears from it, the plaintiff was to do the hauling of the lumber in his own way, and the defendant was in no way liable for his failure or inability to haul in any particular way or by any special mode of conveyance. If the plaintiff contemplated or intended, when he made the contract, to purchase the tramroad, so that he could haul his timber while it was green and thereby get more money for it, it is very sure that there is nothing in the contract which required the defendant to so locate the sidetrack or piling ground at Old Fort as to adjust them to this new method of hauling from the woods to Old Fort, or, in other words, so to place them as that they would be near the terminal of the tramroad or more accessible therefrom. There was nothing of the kind in the contract, and no liability arose out of a failure to do any such thing. To add such a stipulation to the writing, directly or indirectly, would be to vary it, and to make a contract for the parties which they have not made for themselves. If the plaintiff wished to impose a duty of that kind upon the defendant, he should have had it so stated in the contract. It was easy to do so, even if plaintiff had not then acquired ownership of the tramroad, or taken steps to do so. It will not do for one of the parties to allege that something was contemplated other than what we find in the writing itself, which is the final expression of their agreement. All things contemplated or intended by the parties, and all of their previous negotiations, are conclusively presumed, in law, to have been merged in the contract and to be expressed in the written memorial of it.

"Where a contract is wholly in writing, and the intention of the framers is, by law, to be collected from the document itself, then the entire construction of the contract—that is, the ascertainment of the intention of the parties as well as the effect of that intention, is a pure question of law, and the whole office of the jury is to pass on the existence of the alleged written agreement. Where the contract is by parol the terms of the agreement are, of course, a matter of fact, and if these terms be obscure or equivocal, or are susceptible of explanation from extrinsic evidence, it is for the jury to find also the meaning of the terms employed; but the effect of a parol agreement, when its terms are given and their meaning fixed, is as much a question of law as the construction of a written instrument." *Young v. Jeffries,* 20 N. C., 357, op. by *Gaston, J.,* cited and approved in *Wilson v. Cotton Mills,* 140 N. C., 55; *Mining Co. v. Smelting Co.,* 122 N. C., 542, and in *Spragins v. White,* 108 N. C., 449, where the principle is fully discussed. It is not what was contemplated, or what may have been intended, but what they both agreed to do, as evidenced by the writing. *Justice Shepherd* said, in *Moffitt v. Maness,* 102 N. C., 457, 459: "There is, we fear, too great a tendency to relax the well settled rules of evidence against the admissibility of parol testimony, to contradict, vary, or add to the terms of a written contract, and it is thought that the courts, in their anxiety to avoid probable injustice in particular cases, are gradually construing away a principle which has always been considered one of the greatest barriers against fraud and perjury." This Court in that case quotes and approves the following from *Benwick v. Benwick,* 3 Harris (Pa.), 66: "Were the door opened still wider for the admission of all the loose dicta of the parties, running, it might be, as in this instance, through a long course of years, the flood of evil would become so great as to sweep before it every barrier of confidence and safety which human forethought, springing from experience, is so sedulous to raise against the treachery of memory and the falsehood of men. To avoid, therefore, what would really be a social calamity, it is recognized as a settled maxim that oral evidence of an agreement, entertained before its execution, shall not be heard to vary or materially affect it. . . . If any dicta, or even decisions in hostility to this axiom, are to be found, they must be ascribed to the strong desire we are all apt to be swayed by to defeat some strongly suspected fraud in the particular case. But these occasional aberrations but lead to the more emphatic reannunciation of a principle found to be essential to the maintenance of that certainty in human dealings, without which commerce must degenerate into chicanery, and trade become another name for trick." And speaking of the higher dignity and greater certainty of written evidence, *Chief Justice Taylor* said, in *Smith v. Williams,* 5 N. C., 426: "The writers

on the law of evidence have accordingly, in arranging the degrees of proof, placed written evidence of every kind higher in the scale of probability than unwritten, and, notwithstanding the splendid eloquence of Cicero to the contrary, in his declamation for the poet Archias, the sages of our law have said that the fallibility of human memory weakens the effect of that testimony, which the most upright mind, awfully impressed with the solemnity of an oath, may be disposed to give. Time wears away the distinct image and clear impression of facts, and leaves in the mind uncertain opinions, imperfect notions and vague surmises." It is of importance to bear in mind that in those cases, and in all of them, we believe, the attempt was to show orally, not as here, a mere contemplation or intention, but a distinct agreement, or stipulation, concerning a matter not expressed in the written contract. The language of the Court in *Knitting Mills v. Guaranty Co.*, 137 N. C., 565-569, is: "In this contention between the parties we are led to believe that the advantage is decidedly with the defendant. He is relying upon the last written memorial of the contract, which in law is taken to express all that the parties intended to put in it, and which merges in itself all prior or contemporaneous declarations or agreements. The legal effect of a final instrument which defines and declares the intentions and rights of the parties cannot be modified or corrected by proof of any preliminary negotiations or agreement, nor is it permissible to show how the parties understood the transaction in order to explain or qualify what is in the final writing, in the absence of an allegation of fraud or mistake or unless the terms of the instrument itself are ambiguous and require explanation," citing numerous cases.

The charge of the court in this case ignored the express terms of the contract, and directed the jury to consider, upon the questions of breach and damage, a matter entirely extraneous to it, which is not permissible under the well settled rule which we have stated, and the defendant was clearly prejudiced throughout by this error. It extends to the alleged breach of the contract by the defendant, and also to that of the plaintiff set up in its counterclaim. The plaintiff alleged that the defendant had broken its contract, and that he had abandoned the work because of this breach by the defendant; while the defendant alleged that plaintiff abandoned the work without just or legal cause or excuse, and the instruction touched both phases. The instruction was so vital, and so injurious to the defendant, that we would not, in any view, exercise our discretion by restricting the new trial to any one or more of the issues. *Nathan v. R. R.*, 118 N. C., 1066; *Hawk v. Lumber Co.*, 149 N. C., 10.

We therefore conclude that there was error, and the case should be submitted to another jury.

New trial.